IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LADONNA DEGAN, *et al.*,           §
                                   §
    Plaintiffs,                 §
                                   §
v.                                 §
                                   §        Civil Action No. 3:17-CV-01596-N
THE BOARD OF TRUSTEES OF           §
THE DALLAS POLICE AND FIRE         §
PENSION SYSTEM, *et al.*,           §
                                   §
    Defendants.                 §

## ORDER

This Order addresses (1) Defendant The Board of Trustees (the "Board") of the Dallas Police and Fire Pension System's motion to dismiss Plaintiffs LaDonna Degan, Ric Terrones, John McGuire, Reed Higgins, Mike Gurley, Larry Eddington, and Steven McBride's complaint [75] and (2) the Board's motion to strike Plaintiffs' surreply to the motion to dismiss [89]. For the reasons set forth below, the Court grants both motions.

### I. BACKGROUND

The Dallas Police and Fire Pension System (the "Pension System") is a public pension fund that provides comprehensive retirement, death, and disability benefits for approximately 9,300 active and retired City of Dallas police officers and firefighters and their qualified survivors. The Board serves as the governing body of the Pension System. It administers the Pension System according to a Combined Pension Plan Document (the "Plan"),

established by Texas law.  *See* Tex. Rev. Civ. Stat. Ann. art 6243a-1.  The Board has "full

discretion and authority" to construe and interpret the Plan and "to do all acts necessary to

carry out the purpose of" the Plan.  Plan § 3.01(s).

The Pension System contains a feature called the Deferred Retirement Option Plan,

or "DROP."  DROP originally permitted active Pension System members eligible for

retirement to continue working at their normal pay rate, while the monthly pension benefits

they would have received upon retirement were credited to the members' DROP accounts

and held in trust.  After leaving active service, a retiree could elect to leave the funds to

accrue interest in her DROP account, or withdraw the funds under the procedures set forth

in the Plan.  The Plan provided:

> The Pension System shall adopt uniform policies from time to time for the
> deferral of amounts into and the disbursement of amounts from the DROP
> accounts of DROP participants who have terminated Active Service and are
> eligible for a retirement pension.  The policies shall provide flexibility to such
> DROP participants in . . . making total or partial withdrawals from their DROP
> accounts to the extent consistent with the qualification of the Plan under
> Section 401 of the [Internal Revenue] Code and efficient administration.

Plan § 6.14 (e).  Under this provision, the Board previously adopted a withdrawal policy that

permitted retired DROP participants to withdraw DROP funds in three forms: (1) a lump sum

payment of some or all of the retiree's DROP balance; (2) substantially equal payments made

over a specific period; or (3) regular installment amounts added to the member's monthly

benefit payment.  January 14, 2016 DROP Policy § E(3).

In 2016, after negative news about the Pension System surfaced, a run on DROP accounts occurred. On December 5, 2016, City of Dallas Mayor Mike Rawlings filed suit in state district court, seeking a writ of mandamus and injunction prohibiting the Board from distributing DROP funds. On December 8, 2016, the state court entered an unopposed temporary restraining order (the "TRO") prohibiting the Board from distributing any DROP funds pending a temporary injunction hearing. Pursuant to the TRO, the Board directed staff to immediately cease all DROP distributions except for those necessary to satisfy required minimum distribution payments. The Board indicated that it would adopt changes to the DROP policy at a later date.

On January 12, 2017, the Board adopted a DROP Policy Addendum (the "Original Addendum"). The Original Addendum stated in relevant part:

> Except for required minimum distributions and unforeseeable emergency withdrawals . . . no DROP withdrawals will be available before March 31, 2017 . . . .
>
> As of the effective date of this Addendum, all DROP withdrawal requests on file with [the Pension System], including requests for both lump sum payments and monthly installments, shall be null and void.

January 12, 2017 DROP Policy Addendum §§ 3(a), 4(a).

The Original Addendum set forth three mechanisms for distributing DROP funds beginning March 31, 2017: (1) pro rata shares of a monthly "distribution pool" as determined by the Board; (2) at the retiree's election, a minimum annual distribution of $30,000 for 2017 and $36,000 for subsequent years; and (3) distributions due to unforeseeable emergencies.

*Id*. §§ 4–7.  After the Board adopted the Original Addendum, Mayor Rawlings sought no further relief in state court.  He later nonsuited his claims.  Shortly after the Board adopted the Original Addendum, Plaintiffs filed this suit, claiming that the Original Addendum deprived them of their property interests in violation of their substantive and procedural due process rights [1].

Meanwhile, the Texas Legislature was working on proposed changes to the Pension System.  On May 23 and 25, respectively, the Texas Senate and House each unanimously passed H.B. 3158, which amends the Dallas Pension statute, TEX. REV. CIV. STAT. ANN. art 6243a-1.  Act of May 30, 2017, 85th Leg., R.S., ch. 318, § 1.01.  The Texas Governor signed H.B. 3158 into law on May 31, 2017.  Among other things, H.B. 3158 changes the way DROP funds are distributed.  In particular, it mandates that, effective September 1, 2017, DROP funds are to be annuitized and paid to DROP participants over their projected life expectancies.  Members can thus no longer withdraw their DROP funds as a lump sum or roll over the balances of their DROP accounts into their individual retirement accounts ("IRAs").

On June 8, 2017, the Board adopted an amendment to the Original Addendum (the "Revised Addendum") reflecting the changes wrought by H.B. 3158.  Lump sum distributions are no longer available under the Revised Addendum.  Instead, DROP members will receive annuitized monthly or annual DROP distributions throughout their projected life expectancies.  Participants may also apply for hardship-based distributions before or after annuitization.  The Revised Addendum will remain in place until the Board implements new

rules and policies pursuant to H.B. 3158. H.B. 3158 and the Revised Addendum have no net effect on the value of the DROP funds; they merely change the timing of DROP distributions. *See* H.B. 3158 § 1.42; *see also* June 8, 2017 Amendment to DROP Policy Addendum.

On August 1, 2017, Plaintiffs amended their complaint [67]. Plaintiffs now allege that the Original Addendum, H.B. 3158, and the Revised Addendum deprive them of protected property interests without due process in violation of the Fourteenth Amendment to the United States Constitution. Plaintiffs further claim that the Board's actions surrounding H.B. 3158 effect a taking without just compensation in violation of the Fifth Amendment Takings Clause. Finally, Plaintiffs seek a declaratory judgment that the Board's implementation of H.B. 3158 violates both the United States and Texas Constitutions. The Board now moves to dismiss Plaintiffs' amended complaint [75]. For the reasons set forth below, the Court grants the Board's motion.

## II. THE RULE 12(B)(6) LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (citations omitted).

In ruling on a Rule 12(b)(6) motion, a court generally limits its review to the face of the pleadings. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). However, a court may also consider documents outside of the pleadings if they fall within certain limited categories. First, a "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, a "written document that is attached to a complaint as an exhibit is considered part of the complaint and may be considered in a 12(b)(6) dismissal proceeding." *Ferrer*, 484 F.3d at 780. Third, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d

542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)).  Finally, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (citations omitted); *see also, e.g.*, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand").  The Court takes judicial notice of the public records cited in the Board's motion to dismiss, including the Plan, records of the Board's actions, and the Dallas Mayor's suit to enjoin DROP distributions.

### III. THE COURT GRANTS THE BOARD'S MOTION TO DISMISS PLAINTIFFS' DUE PROCESS CLAIMS

Plaintiffs first allege that the Board's implementation of H.B. 3158 and the Revised Addendum violate their Fourteenth Amendment due process rights.  Plaintiffs argue that they have protected property interests in their earned and vested DROP funds.  The Court agrees with Plaintiffs that DROP funds can indeed constitute property.  *See, e.g.*, *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 612 (Tex. App. – Houston [14th Dist.] 2004, no pet.) (treating vested DROP benefits as community property); *see also Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008) (stating that constitutionally protected property interests "are not created by the Constitution itself . . . . 'Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source' and 'that secure

certain benefits and that support claims of entitlement to those benefits.'" (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972))). But even though Plaintiffs have identified a protected property interest, determining whether a due process violation has occurred requires further analysis.

### A. Plaintiffs Have Not Shown A Deprivation of Property

Plaintiffs have failed to show that they were "deprived" of their DROP funds so as to trigger procedural due process protections. Plaintiffs argue that their property interests in the DROP funds necessarily entail the right to unlimited on-demand withdrawals of the funds. But Plaintiffs point to no state law authorizing such unlimited access. Nor does the Plan grant Plaintiffs unfettered access to their DROP accounts. Instead, the Plan permits DROP withdrawals only to the extent that such withdrawals are consistent with efficient Plan administration:

> The Pension System shall adopt uniform policies from time to time for the deferral of amounts into and the disbursement of amounts from the DROP accounts of DROP participants who have terminated Active Service and are eligible for a retirement pension. The policies shall provide flexibility to such DROP participants in . . . making total or partial withdrawals from their DROP accounts to the extent consistent with the qualification of the Plan under Section 401 of the [Internal Revenue] Code and *efficient administration*.

Plan § 6.14(e) (emphasis added). And neither H.B. 3158 nor the Revised Addendum actually takes Plaintiffs' DROP funds. Instead, the provisions merely alter the timing of when Plaintiffs receive their funds. Plaintiffs will receive all of their DROP funds, including previously credited interest plus additional interest at federal treasury rates. *See* H.B. 3158

§ 1.42(e-2); *see also* June 8, 2017 Amendment to DROP Policy Addendum. The actuarial value of Plaintiffs' DROP funds thus remains unchanged. As a result, Plaintiffs cannot demonstrate that they have been deprived of their interests in the DROP funds in a constitutional sense. Plaintiffs' failure is fatal to both their due process and takings claims.[1]

### B. Plaintiffs Have Failed to State a Procedural Due Process Claim

Plaintiffs argue that H.B. 3158 and the Revised Addendum deprive them of their property without due process of law. Even if Plaintiffs could demonstrate that they were deprived of their interests in the DROP funds – which they have not – Plaintiffs have failed to show that (1) they were entitled to due process protections and (2) even if they were entitled to procedural protections, the procedures the Board afforded Plaintiffs were insufficient.

"Procedural due process imposes constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The

---

[1] Whether Plaintiffs challenge the Original Addendum in addition to H.B. 3158 and the Revised Addendum is unclear. For example, Plaintiffs' Amended Complaint asserts that the Original Addendum "deprived Plaintiffs of access to their DROP funds, without any meaningful opportunity to be heard[.]" Am. Compl. ¶ 35 [67]. But in their response to the Board's motion to dismiss, Plaintiffs apparently view the Original Addendum favorably, arguing that "the arbitrariness of the [Revised Addendum] is demonstrated by its deviation from the [Original] Addendum adopted by the Board in January 2017." Pls.' Resp. 18 [86]. Because the Original Addendum is no longer in place, the issue appears to be moot. And whether or not Plaintiffs challenge the Original Addendum, Plaintiffs' failure to allege a deprivation of their DROP funds – as a result of either the Original or the Revised Addendum – necessarily dooms both their due process and takings claims.

Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Id.* at 333. However, "[w]here a rule . . . applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption," so legislative bodies may implement general policies without providing notice-and-hearing procedures to all affected parties. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). As a result, "it is well established law that once an action is characterized as legislative, procedural due process requirements do not apply." *Jackson Court Condos., Inc. v. City of New Orleans*, 874 F.2d 1070, 1074 (5th Cir. 1989). This is because when a legislative action "affects a general class of persons, those persons have all received procedural due process – the legislative process." *Cnty. Line Joint Venture v. City of Grand Prairie, Tex.*, 839 F.2d 1142, 1144 (5th Cir. 1988).

Here, the Texas Legislature's passage of H.B. 3158 was unquestionably a legislative act. As a result, Plaintiffs were not entitled to individualized notice and hearing procedures with respect to the bill. *See Jackson*, 874 F.2d at 1074. And the Revised Addendum merely amends the Plan to comply with H.B. 3158; it imposes no additional burdens on Plaintiffs. Because H.B. 3158 was a legislative action, and the Revised Addendum merely implements H.B. 3158, Plaintiffs "all received procedural due process – the legislative process." *Cnty. Line*, 839 F.2d at 1144.

Further, even if Plaintiffs were entitled to such additional procedures, Plaintiffs have failed to show that the procedures the Board afforded them were insufficient.[2]  Plaintiffs do not allege that they were denied notice of and an opportunity to participate in the legislative proceedings that resulted in H.B. 3158.  And the Board adopted both the Original and Revised Addenda at duly noticed public meetings at which Plaintiffs had an opportunity to be heard.  This is all procedural due process requires.  *See, e.g., Marco Outdoor Adver., Inc. v. Reg. Transit Auth.*, 489 F.3d 669, 673 (5th Cir. 2007) ("The 'root requirement' of due process is 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" (emphasis in original) (quoting *McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco, Dept. of Bus. Regulation of Fla.*, 496 U.S. 18, 37 (1990)).  The Court thus holds that Plaintiffs have failed to state a Fourteenth Amendment procedural due process claim.[3]

### C. Plaintiffs Have Failed to State a Substantive Due Process Claim

Plaintiffs next assert that H.B. 3158 and the Revised Addendum violate their substantive due process rights.  As an initial matter, the substantive due process doctrine

---

[2] Plaintiffs do not attempt to address what additional or substitute procedures would have satisfied due process requirements here.  Instead, they assert only that the Board "took away [Plaintiffs'] property rights without due process being afforded to Plaintiffs."  Am. Compl. ¶ 29 [67].

[3] In fact, Plaintiffs appear to concede that they have not stated a procedural due process claim.  Plaintiffs failed to address the Board's procedural due process arguments in their response to the Board's motion to dismiss.

"prohibits only the most egregious official conduct . . . and will rarely come into play." *Jordan v. Fisher*, 823 F.3d 805, 812–13 (5th Cir. 2016) (internal quotation marks omitted). Substantive due process protections "have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (citations omitted).  Where substantive due process claims do not implicate a fundamental right, the Fifth Circuit applies rational basis review to the challenged actions.  *Reyes v. NTTA*, 861 F.3d 558, 561 (5th Cir. 2017).  "[G]overnmental actions involving social and economic regulation that do not interfere with the exercise of fundamental rights . . . are presumed to be constitutionally valid."  *Yur-Mar, L.L.C. v. Jefferson Par. Council*, 451 Fed. App'x 397, 401 (5th Cir. 2011) (citations omitted). Plaintiffs do not allege that either H.B. 3158 or the Revised Addendum implicates any fundamental right.  Indeed, they appear to recognize that rational basis review applies.  *See* Pls.' Resp. at 18 (discussing rational basis test).  Because the challenged regulations are economic in nature and implicate no fundamental rights, the Court will review them under the "notoriously deferential" rational basis standard.  *Reyes*, 861 F.3d at 561–62.

　　To survive rational basis review, the government's actions must be "rationally related to a legitimate government interest."  *Id*. at 561 (citing *FM Props. Op. Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996)).  The government's asserted interest "need not be the actual or proven interest, as long as there is a connection between the policy and a 'conceivable' interest."  *Reyes*, 861 F.3d at 63 (quoting *FM Props.*, 93 F.3d at 175).

Here, the Board's asserted interests include improving the Pension System's projected solvency and preserving its ability to provide benefits to the approximately 9,300 police officers and firefighters it serves. Given that the Pension System was projected to become insolvent within the next decade if the Texas Legislature and the Board did not act, the Board's asserted interests were certainly legitimate. And H.B. 3158 and the Revised Addendum are at the very least rationally related to these interests. Among other things, they limit the Pension System's unrestricted cash outflows, reduce its unfunded liability, and increase its funded ratio. Because the challenged actions are at least rationally related to the Board's legitimate interests, Plaintiffs have failed to state a substantive due process claim upon which relief can be granted. *See Reyes*, 861 F.3d at 561.

## IV. THE COURT GRANTS THE BOARD'S MOTION TO DISMISS PLAINTIFFS' TAKINGS CLAIM

Plaintiffs next assert that H.B. 3158 and the Revised Addendum deprive them of their DROP funds without just compensation in violation of the Fifth Amendment Takings Clause. As set forth in section III(A) *supra*, Plaintiffs have not shown that they were deprived of their DROP funds so as to trigger any constitutional protections. But even if Plaintiffs had sufficiently alleged a deprivation, the Court holds that Plaintiffs have failed to state a takings claim for other, independent reasons.[4]

---

[4] The Board asserts that the Fifth Circuit's recent decision in *Van Houten* means that legislative changes to pension benefits categorically "cannot be the basis of a . . . takings clause challenge." 827 F.3d at 540. But *Van Houten* addressed only prospective changes to *unvested* pension benefits. The *Van Houten* court did note that any contractual right to

### A. Legal Standard

"The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth [Amendment]. . . provides that private property shall not 'be taken for public use, without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (citations omitted). "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Id*. at 537 (citations omitted). This is known as a *per se* taking. *Id*. at 538. However, the Supreme Court has "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster – and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Id*. In determining "how far is 'too far,'" however, courts "must remain cognizant that 'government regulation – by definition – involves the adjustment of rights for the public good.'" *Id*. (quoting *Andrus v. Allard*, 444 U.S. 51, 65 (1979)). The Supreme Court has "recognized, in a wide variety

---

pension benefits "is a right expressly 'made subject to the reserved power of the Legislature to amend, modify, or repeal the law upon which the pension system is erected.'" 827 F.3d at 539–40 (quoting *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (Tex. 1937)). But it also recognized that the Texas Legislature passed Article XVI, Section 66 of the Texas Constitution ("Section 66") specifically to overturn *Trammell* in the context of *vested* pension benefits. *Van Houten*, 827 F.3d at 537–38 ("As we have interpreted it, Section 66 reverses the core unfairness of the *Trammell* decision by ensuring that *earned benefits* cannot be reduced." (emphasis added)). Indeed, the Texas Supreme Court case the Fifth Circuit referenced in its takings discussion specifically stated that its analysis might have differed had Section 66 been at issue. *See Klumb v. Houston Mun. Employees Pension Sys.*, 458 S.W.3d 1, 16 (Tex. 2015). But because the City of Houston had opted out of Section 66, the issue was not presented. *Id*. Because Plaintiffs have vested interests in their DROP funds, *Van Houten* does not categorically bar their takings claim.

of contexts, that government may execute laws or programs that adversely affect recognized economic values." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Indeed, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Lingle*, 544 U.S. at 538 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).

The Supreme Court has established two "relatively narrow" categories of government action that generally will qualify as *per se* takings. *Lingle*, 544 U.S. at 538. First, "where government requires an owner to suffer a permanent physical invasion of her property – however minor – it must provide just compensation." *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). Second, where government action "completely deprive[s] an owner of '*all* economically beneficial use[]' of her property," a "total regulatory taking" has occurred and the government must pay just compensation. *Lingle*, 544 U.S. at 538 (emphasis in original) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019, 1026 (1992)).

Outside of these categories, courts examine regulatory takings challenges under the standards set forth in *Penn Central*. *Lingle*, 544 U.S. at 538. The *Penn Central* Court acknowledged that it had been "unable to develop any 'set formula'" for evaluating regulatory takings claims, but it did identify "'several factors that have particular significance.'" *Id.* (quoting *Penn Cent.*, 438 U.S. at 124). *Penn Central* focused on three factors: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to

which the regulation has interfered with distinct investment-backed expectations," and (3) "the 'character of the governmental action' – for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Lingle*, 544 U.S. at 538–39 (quoting *Penn Cent.*, 438 U.S. at 124).

### B. Plaintiffs Have Failed to State a Per Se Takings Claim

Plaintiffs argue that the Board, through H.B. 3158 and the challenged Addenda, has "unlawfully seized the funds held in Plaintiffs' DROP accounts, denying Plaintiffs' and the class members' ability to direct how and when such funds are distributed." Pls.' Resp. 7 [86]. Plaintiffs thus appear to be asserting a *per se* takings claim. *See Lingle*, 544 U.S. at 537–38. Plaintiffs analogize their asserted deprivation to the takings at issue in *Loretto*, 458 U.S. 419, and *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015). But each of those cases involved an actual physical invasion or deprivation of property. In *Loretto*, the Supreme Court held that a state law requiring landlords to permit the direct physical attachment of permanent cable installations on their property effected a *per se* taking. 458 U.S. at 438. And in *Horne*, the Court held that a *per se* taking occurred when the government required plaintiff raisin growers to transfer actual raisins, along with title to the raisins, to the government. 135 S. Ct. at 2428. Plaintiffs have not alleged any such physical invasion or deprivation here. As a result, Plaintiffs have failed to state a *per se* takings claim.

### *C. Plaintiffs Have Failed to State a Regulatory Takings Claim*

Plaintiffs have also failed to state a regulatory takings claim.[5]  "A regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking under *Penn Central*," 438 U.S. 104.  *Horne*, 135 S. Ct. at 2429.  Thus, the Court analyzes regulatory takings claims under the factors set forth in *Penn Central* to determine whether a compensable taking has occurred.  Here, the Court holds that Plaintiffs have failed to sufficiently allege that H.B. 3158 and the Addenda effect a regulatory taking of their DROP funds.

First, the Court examines the economic impact of the challenged regulations.  *See Penn Cent.*, 438 U.S. at 124.  The economic impact of H.B. 3158 and the Addenda, while not wholly inconsequential, is not so severe as to constitute a regulatory taking of Plaintiffs' property.  H.B. 3158 and the Addenda do not deprive Plaintiffs of their DROP funds. Instead, they merely alter the timing for Plaintiffs to receive their funds.  And Plaintiffs may request DROP withdrawals through hardship procedures established by the Board, further mitigating the economic impact of the challenged provisions.  A regulation does not effect a taking solely because the property owner cannot make "the most beneficial use of the property." *Id.* at 125.  Although Plaintiffs are no longer able to withdraw their DROP funds at will, the amount of the funds has not been reduced.  Plaintiffs will receive the actuarial

---

[5] Whether Plaintiffs intend to assert a regulatory takings claim is unclear.  For the sake of completeness, the Court examines Plaintiffs' takings claim under both the *per se* and regulatory frameworks.

equivalent of their DROP funds via the annuitization provision.  The economic impact of H.B. 3158 and the Addenda thus weighs against the conclusion that a regulatory taking occurred.

Second, the Court examines the extent to which the challenged regulations interfere with the parties' distinct investment-backed expectations.  *Id*. at 124.  Plaintiffs imply that they participated in DROP under the assumption that, once they were eligible to access their DROP funds, they could continue to withdraw the funds at will.   But the Plan itself authorized the Board to adjust DROP distribution policies as necessary for efficient Plan administration.  *See supra* Section I.  The Plan also authorized members themselves to amend the Plan if certain requirements were satisfied.  Plan § 8.01.  And, as stated above, Plaintiffs' DROP funds have not actually decreased; instead, Plaintiffs will receive the annuitized funds over time.  "No person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit."  *Custom Seal, Inc. v. Duro-Last Roofing, Inc.*, No. 6:11-CV-122, 2012 WL 12930886, at \*5 (E.D. Tex. Sept. 20, 2012) (quoting *N.Y. Cent. R. Co. v. White*, 243 U.S. 188, 198 (1917)).  Indeed, "[i]f every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever."  *Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 n.24 (1994) (quoting L. Fuller, The Morality of Law 60 (1964)).  The Court thus holds that the second *Penn Central* factor also weighs against holding that a regulatory taking occurred.

Finally, the Court examines the "character of the governmental action." *Penn Cent.*, 438 U.S. at 124. The Supreme Court has stated that "a 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* (citations omitted). Here, the Board has not "physically invade[d] or permanently appropriate[d] any of [Plaintiffs'] assets for its own use." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225 (1986). Instead, it merely has changed the way that DROP funds will be distributed going forward. Such an "adjustment to the benefits and burdens" of the Pension System's members does not effect a regulatory taking of Plaintiff's DROP funds. After examining the *Penn Central* factors in the particular circumstances of this case, the Court thus holds that Plaintiffs have failed to state a regulatory takings claim.

## V. THE COURT GRANTS THE BOARD'S MOTION TO DISMISS PLAINTIFFS' CLAIM FOR DECLARATORY JUDGMENT

Plaintiffs seek a declaratory judgment that the Board's implementation of H.B. 3158 violates the United States and Texas Constitutions because it deprives them of their vested property rights in the DROP funds. As set forth above, Plaintiffs have failed to sufficiently allege that such a deprivation occurred. The Court thus grants the Board's motion to dismiss Plaintiffs' declaratory judgment claim.

## VI.  H.B. 3158 AND THE REVISED ADDENDUM DO NOT
## VIOLATE THE TEXAS CONSTITUTION

Finally, Plaintiffs argue that H.B. 3158 and the Revised Addendum unlawfully impair

their interests in the DROP funds in violation of the Texas Constitution.[6]  In 2003, the Texas

Legislature added Article XVI, section 66 ("Section 66") to the Texas Constitution.  Section

66 reads:

> (d) On or after the effective date of this section, a change in service or
> disability retirement benefits or death benefits of a retirement system may not
> reduce or *otherwise impair* benefits accrued by a person if the person:
>
>> (1) could have terminated employment or has terminated employment
>> before the effective date of the change; and
>>
>> (2) would have been eligible for those benefits, without accumulating
>> additional service under the retirement system, on any date on or after
>> the effective date of the change had the change not occurred.
>
> (e) Benefits granted to a retiree or other annuitant before the effective date of
> this section and in effect on that date may not be reduced or *otherwise
> impaired*.

TEX. CONST. ART. XVI § 66 (emphasis added).

The history of Section 66 demonstrates that the provision concerns changes in vested

benefits themselves – not changes in the timing of when pensioners receive them.  In *City of

Dallas v. Trammell*, the Texas Supreme Court held that a retiree's interest in his accrued

monthly pension payments was subordinate to the Texas Legislature's right to reduce the

amount of his accrued benefits thereunder.  101 S.W.2d 1009, 1011, 1013 (Tex. 1937).  The

---

[6] Plaintiffs do not formally assert an independent Section 66 claim, but the Court considers their Section 66 argument for the sake of completeness.

Texas Legislature intended Section 66 to reverse *Trammell* by prohibiting the reduction or impairment of such benefits. Two recent decisions construing Section 66 illustrate this point.

The first decision is *Van Houten v. City of Fort Worth*, a case involving the city of Fort Worth's police officers and firefighters' pension fund. 827 F.3d 530 (2016). The city enacted pension reforms that prospectively decreased (1) the rate at which future retirement benefits accrued and (2) cost-of-living adjustments to the plan for current employees. *Id*. at 533. A group of Fort Worth police officers and firefighters sued the city, alleging that the pension reforms violated Section 66. *Id*. at 532. The district court held that the pension reforms complied with Section 66 and granted summary judgment for the city. *Id*. at 533. The Fifth Circuit affirmed. *Id*. at 532. It reasoned that (1) Section 66(d) "prohibits the impairment of *accrued* benefits for *vested* employees"; (2) "[t]here is an understood difference between the concepts of benefit *accrual* and *vesting*"; and (3) "[t]his understanding essentially resolves the case." *Id*. at 534. (emphases in original). The Court then noted that:

> When it comes to public pension protection, Texas is known to be an outlier. In 1937, the Texas Supreme Court decided [*Trammell*] and held that pensioners' rights to accrued benefits were subject to the legislative power of the state "to amend, modify, or repeal the law upon which the pension system is erected." [101 S.W.2d at 1014]. The ruling meant that C.W. Trammell, a retired Dallas police officer whose monthly pension was cut from $183.33 to $72.16, had no recourse. While other states enacted laws to protect public pensions from similar cuts, Texas held its course – until the enactment of Section 66. As one Texas appellate court put it, Section 66 "was proposed and adopted specifically to change the result of the *Trammell* decision, albeit 70 years later." *Davidson v. McLennan Cty. Appraisal Dist.*, No. 10-11-00061-

CV, 2012 WL 3799149, at *5 (Tex. App. – Waco Aug. 30, 2012, pet. denied) (mem. op.).

> As we have interpreted it, Section 66 reverses the core unfairness of the *Trammell* decision by ensuring that earned benefits cannot be reduced. By going no further, our interpretation of Section 66 stays true to Texas' long-held flexible approach permitting municipalities to revise their pension plans in light of changing economic conditions.

*Van Houten*, 827 F.3d at 537–38. *Van Houten* thus stands for the propositions that Section 66 (1) reverses the core holding in *Trammell* and (2) permits prospective changes to the public pension plans it covers. *Id*. at 538. But *Van Houten* leaves open the question at issue here: that is, what constitutes an "impairment" under Section 66.

The second recent case construing Section 66 is *Eddington v. Dallas Police and Fire Pension System*, 508 S.W.3d 774 (Tex. App. – Dallas 2016, pet. filed). *Eddington* is a Dallas Court of Appeals case arising from the Board's decision to amend the Plan to reduce future DROP account interest rates and require participants to accelerate their withdrawals of DROP funds. *Id*. A group of current and retired City police officers sued the Pension System and the Board's chair, asserting that the amendments violated Section 66's prohibition on reducing or impairing retirement benefits. *Id*. at 775. The trial court ruled that the challenged amendments did not violate Section 66 and dismissed the plaintiffs' claims. *Id*. The Dallas Court of Appeals affirmed. *Id*. at 776. At the outset, the court noted that the parties did "not dispute that the Texas Legislature's passage of Section 66 was intended to reverse the result of *Trammell*." *Id*. at 784. Then, assuming without deciding that DROP was a "service retirement benefit" for Section 66 purposes, the court held that the DROP

interest rate was "not among the 'benefits' protected by Section 66." *Id.* at 788 (citing *Van Houten*, 827 F.3d at 535). The court also rejected the plaintiffs' argument that the accelerated DROP withdrawal requirements impaired or reduced their DROP benefits. *Eddington*, 508 S.W.3d at 789. The court noted that, other than being prevented from benefitting from the DROP interest rate, the plaintiffs had not shown any reduction or impairment in their DROP benefits as a result of the accelerated withdrawal requirement. *Id*.

Both *Van Houten* and *Eddington* demonstrate that the Texas Legislature intended Section 66 to reverse *Trammell*. And *Trammell* approved reductions in the *amount* of pension benefits – not changes in the timing by which pensioners might receive them. 101 S.W.2d at 1013. Thus, Section 66 can be reasonably interpreted as protecting the value, not the distribution timing, of covered pension benefits. But Plaintiffs now contend that, by changing the timing of their receipt of the DROP benefits, H.B. 3158 and the Revised Addendum impair the benefits in violation of Section 66. The Court disagrees.

As an initial matter, the parties do not dispute that Plaintiffs have a vested interest in their accrued DROP benefits. But that alone is insufficient to find a violation of Section 66. To violate Section 66, the challenged Plan amendments must either reduce or impair the DROP benefits. Plaintiffs do not contend that H.B. 3158 and the Revised Addendum reduce the DROP benefits. Nor could they: both H.B. 3158 and the Revised Addendum leave the

value of the DROP benefits untouched. Instead, Plaintiffs argue that the challenged amendments *impair* the DROP benefits.

According to Black's Law Dictionary, to "impair" is "to diminish the value of (property or a property right)." *Black's Law Dictionary* 869 (10th ed. 2014). Thus, while a "reduction" would mean a direct decrease in the DROP benefits themselves, an "impairment" encompasses any other action that might diminish the benefits' value. For example, altering the timing for DROP participants to receive their benefits without permitting interest to accrue on the funds such that the net present value of the benefits actually decreased would likely qualify as an impairment under Section 66. But H.B. 3158 and the Revised Addendum effect no such impairment. Plaintiffs will receive every dollar of their DROP funds, and the funds will accrue interest at the T-Bill rate such that their net present value will remain unchanged. And while the T-Bill rate is lower than the rate at which the funds originally accrued interest, Section 66 does not create a right to future interest rates. *See Eddington*, 508 S.W.3d at 788 ("the DROP interest rate is not among the 'benefits' protected by Section 66." (citing *Van Houten*, 827 F.3d at 535)). Because H.B. 3158 and the Revised Addendum change only the timing of DROP distributions, Plaintiffs have failed to show that they reduce or impair the DROP benefits in violation of Section 66.

The Texas Legislative Council's[7] reading of Section 66 supports this view. The Council interpreted Section 66 to mean that "any change made to certain benefits provided by certain retirement systems cannot reduce benefits that a person was entitled to receive before the date of the change." Tex. Leg. Council, Condensed Analysis of Proposed Const. Amendments, September 13, 2003 Election at 99 (2003). It stated that, "[u]nder the amendment, any reduction in the retirement or death benefits that the retirement systems provide cannot be applied retroactively to benefits that a person has accrued or is entitled to receive before the date the reduction takes effect." *Id.* Nowhere did the Council refer to changes in *distribution timing* for accrued pension benefits.

Given Section 66's history and subsequent interpretation, it stands to reason that the Texas Legislature intended Section 66 to prohibit changes that would reduce or otherwise impair retirees' *benefits* – not the timing of when they can receive them. *See* TEX. CONST. ART. XVI § 66. H.B. 3158 and the Revised Addendum effect no such reduction or impairment. They merely alter the timing for DROP participants to receive the unimpaired funds going forward. The Court believes the Texas Supreme Court is unlikely to hold that a change in distribution timing that leaves the underlying funds untouched reduces or impairs those funds within the meaning of Section 66.

---

[7] The Texas Legislative Council is a "nonpartisan legislative agency that provides bill drafting, computing, research, publishing, and document distribution services to the Texas Legislature and the other legislative agencies." TEXAS LEGISLATIVE COUNCIL, http://www.tlc.state.tx.us/ (last visited March 7, 2018). The council also serves as an information resource for Texas agencies and citizens. *Id.*

## CONCLUSION

The Court grants the Board's motion to dismiss Plaintiffs' first amended complaint [75].  Because Plaintiffs have not requested leave to amend, the Court grants the Board's motion with prejudice.  The Court also grants the Board's motion to strike Plaintiffs' surreply to the Board's motion to dismiss [89].[8]

Signed March 14, 2018.

David C. Godbey
United States District Judge

_____

[8] The Court has reviewed Plaintiffs' surreply and determined that, even if the Court denied the Board's motion to strike, the surreply would not have affected the Court's holding in this case.

ORDER – PAGE 26